UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **CHARLES BLACKWELL,** | **2:21-CV-10628-TGB-EAS** |
| Plaintiff, | |
| vs. | **ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION TO DISMISS (ECF NO. 27)** |
| **CITY OF INKSTER and PATRICK ANDRE WIMBERLY,** | |
| Defendants. | |

On March 22, 2021, Plaintiff Charles Blackwell filed a pro se Complaint against the City of Inkster ("Inkster" or "the City") and Inkster's Mayor, Patrick Andre Wimberly ("Mayor Wimberly") in his individual and official capacities. ECF No. 1. Plaintiff posted a number of comments on the Facebook pages of Inkster's Police Department and Mayor Wimberly criticizing Inkster's government for its lack of transparency surrounding an investigation into alleged embezzlement in the City's government. Defendants deleted these critical comments and blocked Plaintiff from making additional comments on the social media pages. Plaintiff filed the instant suit, alleging that Defendants' conduct violated his First Amendment right to free speech.

On April 12, 2021, Plaintiff and Inkster stipulated that, while this action proceeded, Plaintiff would be allowed to post comments on social media accounts controlled by Inkster, and the accounts of Mayor Wimberly or Inkster Council Members. Stip. Injunction Order, ECF No. 9, PageID.49-51. However, in early June, 2021, the Inkster employee responsible for managing the city's Instagram page blocked Plaintiff from commenting on the account for approximately three hours. Based on that short denial of access, Plaintiff has asked the Court to hold Defendants in contempt for violating the stipulated preliminary injunction order. Pl's Contempt Mot., ECF No. 17. Blackwell's motion is fully briefed. *See* ECF Nos. 22, 23.

On June 1, 2021, Defendants moved to dismiss Blackwell's complaint. ECF No. 18. Blackwell subsequently retained counsel and, this time with assistance of counsel, filed an Amended Complaint on July 2, 2021. ECF No. 25. The Court therefore denied Defendants' Motion to Dismiss as moot. ECF No. 26. In his Amended Complaint, Blackwell asserts two *Monell* claims against Defendants under 42 U.S.C. § 1983 for: (Count I) violations of the First and Fourteenth Amendments regarding the Inkster Police Department Facebook Page and; (Count II) violations of the First and Fourteenth Amendments regarding Mayor Wimberly's Facebook Page. Am. Compl., ECF No. 25, PageID.285-295. Plaintiff brings this action against Inkster and Mayor Wimberly, in both his official and individual capacities, seeking declaratory and injunctive

relief as well as monetary damages. *Id.* at PageID.270-71, 295. On July 20, 2021, Defendants again moved to dismiss Blackwell's complaint under Federal Rules of Civil Procedure 12(b)(1) and (b)(6). *See generally,* Def's Mot., ECF No. 27. The motion is fully briefed. *See* ECF Nos. 29, 30. Finding the facts and legal arguments sufficiently presented in the parties' briefs, the Court will resolve this motion on the briefs and without oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f). For the reasons explained below, Defendants' motion will be **DENIED** in large part, but the motion will be **GRANTED IN PART** as to the claims against Mayor Wimberly in his individual capacity on the basis of qualified immunity, and those claims will be dismissed with prejudice.

## I.    Background

Plaintiff Blackwell describes himself as an "activist who tackles corruption, transparency, and open government issues with multiple municipalities in the Metro Detroit area." Am. Compl. ¶ 15, ECF No. 25, PageID.274. In early 2021, Inkster's Parks and Recreation director was accused of embezzling money from the city. *Id.* at ¶¶ 6, 21, 22, 24, PageID.272, 275-76. Inkster's Police Department investigated the allegations. Am. Compl. Ex. C, ECF No. 25-4. According to Plaintiff, although city officials concluded that the Parks and Recreation director needed to repay the city, they determined that "no further action or discipline" was necessary. Am Compl. ¶¶ 23, PageID.275. Concerned

about this result, Plaintiff says he became suspicious of the possibility that corruption existed in Inkster's Recreation Department and City Hall. *Id.* at ¶ 28, PageID.276-77.

In March 2021, Inkster's police chief posted a video of himself reading a children's book on the Police Department's Facebook Page. *Id.* at ¶ 7, PageID.272. On March 18, 2021, Blackwell wrote a comment "underneath the police chief's video implicitly criticizing the chief and urging him to be transparent about [the Mayor's] involvement." *Id.* at ¶¶ 8; 30-32, PageID.272, 277-78. The page's administrator, an Inkster Police Department employee, deleted Blackwell's comment, and blocked Blackwell from making further comments on the Police Department's page. *Id.* at ¶¶ 9, 33-34, PageID.272, 278-79. Plaintiff also posted similar critical comments on the Mayor's Facebook Page. *Id.* at ¶ 11, PageID.273. These comments were also deleted, and Blackwell was also blocked from commenting on the Mayor's page. *Id.* Specifically, Plaintiff "exposed publicly on [Mayor] Wimberly's municipal Facebook page that [Mayor] Wimberly has owed delinquent property taxes to the City of Inkster while serving as Inkster's mayor." *Id.* at ¶ 62, PageID.284. Blackwell points out that although his comments on both pages were deleted and he was blocked, other people, who made comments that were not critical, were not blocked, and their comments were not deleted. *Id.* ¶¶ 10, 12, PageID.273.

### a. The social media pages

#### i.  The Inkster Police Department Facebook page

Inkster's Police Department Facebook page was created by Inkster and "[the] page is managed by the Inkster Police . . . .'" Am. Compl. Ex. G, PageID.321. The "Additional Information" section of the page explains that:

> This page was developed to assist us in providing the highest level of service possible in our community. The hope is that this page will provide an avenue to communicate between the public and the police on breaking news or need to know issues that impact the fine citizens of Inkster . . . We welcome your suggestions and/or comments on how well it serves your needs.

*Id.* at PageID.322. This section also included a policy which stated in part: "Inkster reserves the right, at our sole discretion, to: . . . [b]lock users or remove comments if the content posted promotes private businesses, political affiliations, ideologies or positions, or any other third-party advertisements, sales or promotions[.]" *Id.* According to Blackwell, Inkster's official custom or policy is to delete critical comments or block users who express viewpoints with which it disagrees. Am. Compl. ¶¶ 45-47, ECF No. 25, PageID.281.

#### ii.  The Mayor Wimberly Facebook page

Mayor Wimberly's page is maintained and operated by Wimberly. Am. Compl. ¶ 48, ECF No. 25, PageID.282. According to Blackwell, the page bears a "banner photo above the title 'Patrick Wimberly-Mayor City

of Inkster,'" that includes "the City of Inkster logo and tagline 'Inkster Let's Stay Home & Stay Safe.'" *Id.* at ¶ 52, PageID.282. Blackwell claims, upon information and belief, that "Defendant Wimberly maintains and controls a personal Facebook page for his own personal use separate from the Patrick Wimberly-Mayor City of Inkster municipal Facebook page." *Id.* at ¶ 54. Blackwell further alleges that Mayor Wimberly uses the page at issue here "to disseminate information about city-related activities and issues, and routinely shares information from other municipal Facebook pages," and that Mayor Wimberly "posts live videos of himself at City of Inkster public buildings with the U.S. flag behind him addressing [the] public and followers of the Facebook page." *Id.* at ¶¶ 55, 57, PageID.283. Mayor Wimberly "hosted a Community Conversation with Facebook users on January 27, 2021 which was advertised on Facebook as a live streamed conversation with the Mayor from his government office. The event was live streamed using the Patrick Wimberly-Mayor City of Inkster Facebook page." *Id.* at ¶ 59. Blackwell alleges that the Defendants' use of Mayor Wimberly's page "and engagement with the public in open dialogue about city issues demonstrate their intent to create a forum to engage in an exhange [sic] of ideas with the public, not a one-way outlet for government speech." *Id.* at ¶ 60.

## II.   Standard of Review

A party may raise a defense to a claim for lack of subject-matter jurisdiction by motion. Fed. R. Civ. P. 12(b)(1). A party may move to

dismiss under 12(b)(1) by making either a facial or factual attack. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). A factual attack challenges whether subject matter jurisdiction exists as a factual matter. *Id.* When considering a 12(b)(1) motion premised on a factual attack, the Court need not assume the truthfulness of the plaintiff's factual allegations and may weigh evidence to "satisfy itself" that it does or does not have jurisdiction to hear the case. *Id.*

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a court to dismiss a lawsuit if it "fails to state a claim upon which relief can be granted." Rule 8(a) requires only that pleadings contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Though this standard is liberal, courts have held that it requires plaintiffs to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action" in support of their grounds for entitlement to relief. *Albrecht v. Treon*, 617 F.3d 890, 893 (6th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)).

In evaluating a motion to dismiss under Rule 12(b)(6), courts must construe the complaint in the light most favorable to the plaintiff and accept all well-pled factual allegations as true. *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006)). Consideration of a motion to dismiss under Rule 12(b)(6) is generally confined to the

pleadings. *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008). Courts may, however, consider any exhibits attached to the complaint or the defendant's motion to dismiss "so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)).

## III.   Discussion

Defendants first argue that Plaintiff lacks standing because his claims are moot—Defendants say that they have ceased any behavior that infringes on Plaintiff's rights. Def's. Mot., ECF No. 27, PageID.347-50. Defendants also argue that Blackwell's amended complaint fails to state a claim because: (i) the subject social media pages are government or personal speech not subject to protection; and (ii) qualified immunity bars claims against Mayor Wimberly in his individual capacity. *Id.* at PageID.350-63. Blackwell, for his part, argues that he has stated a claim and that his claims are not moot, because the social media pages are public forums and Defendants censored and may continue to censor his speech based on his viewpoint. Pl's. Resp., ECF No. 29. Because this Court may only resolve justiciable issues brought by plaintiffs with standing, the Court must resolve whether or not Blackwell's claims are moot before proceeding to the merits of Blackwell's First Amendment claims.

### a. Whether Blackwell's claims are moot

Defendants challenge Blackwell's standing: specifically, they argue that his claims are moot and should be dismissed under Federal Rule of Civil Procedure 12(b)(1). In arguing that Plaintiff's claims are moot, Defendants invoke the "voluntary cessation" doctrine—they argue that they have restored Blackwell's ability to comment on the relevant pages, have stipulated to an order preserving Blackwell's ability to do so while this lawsuit proceeds and, with affidavits in support, explain that they will refrain from blocking any person or hiding any comments without "a determination first by the City attorney's office that the comment is considered unprotected speech. *See* Def's. Mot., ECF No. 27, PageID.349-50. Thus, Defendants argue, "Plaintiff's claims are moot as his ability to comment has been restored on the pages, and affidavits . . . demonstrate that there is a reasonable expectation that the alleged violation will not recur." *Id.* at PageID.339.

Plaintiff responds that these assurances do not make it "absolutely clear" that the blocking and deleting conduct by Defendants will not recur because: "(1) Defendants have already violated the preliminary injunction in this case; (2) Defendants' asserted change in behavior is wholly discretionary and not based on a legislative or regulatory change in policy; and (3) the timing of Defendants' asserted change raises strong suspicions that their assurances are not genuine." Pl's. Resp., ECF No.

29, PageID.1319-20 (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).

Article III of the Constitution "confines the power of the federal courts to adjudication of 'cases' or 'controversies,'" thus, the "mootness doctrine . . . demands a live case-or-controversy when a federal court decides a case." *Ky. Right to Life v. Terry*, 108 F.3d 637, 644 (6th Cir. 1997)(citations omitted). A party asserting mootness bears the "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again." *Friends of the Earth*, 528 U.S. 167, 189 (2000)(citation cleaned up). Here, the Defendants have not met their "heavy burden" to demonstrate that Blackwell's claims are moot.

"[A]s a general rule, 'voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot.'" *Los Angeles Cty. v. Davis*, 440 U.S. 625, 631 (1979)(citation and internal marks omitted). "If it did, courts would be compelled to leave the defendant . . . free to return to his old ways." *Friends of the Earth*, 528 U.S. at 189 (citation cleaned up). In the Sixth Circuit, claims by a governmental actor that it has voluntarily ceased offensive behavior are viewed "with more solicitude" than similar claims of voluntary cessation by private parties. *Ammex, Inc. v. Cox*, 351 F.3d 697, 705 (6th Cir. 2003); *see also Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 982 (6th Cir. 2012) (citation omitted) (noting that courts should "place greater stock in [government officials'] acts of

10

self-correction" than those of private parties, "so long as they appear genuine"); *see also Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019)("Although the bar is high for when voluntary cessation by a private party will moot a claim, the burden in showing mootness is lower when it is the government that has voluntarily ceased its conduct.").

In *Speech First*, the Sixth Circuit explained that voluntary cessation will only moot a case where there is: (i) "no reasonable expectation that the alleged violation will recur"; and (ii) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id.* at 767 (internal citations omitted). But while, as explained above, "all government action receives *some* solicitude, not all action enjoys the same *degree* of solicitude." *Id.* at 768 (emphasis added). Determining whether ceased government action "could not reasonably be expected to recur . . . takes into account the totality of the circumstances surrounding the voluntary cessation, including the manner in which the cessation was executed." *Id.* at 768 (internal marks and citation omitted). For example, if the government voluntarily ceases its action by legislative change, "that change will presumptively moot the case unless there are clear contraindications that the change is not genuine." *Id.* (collecting cases). However, if the change "is merely regulatory, the degree of solicitude the voluntary cessation enjoys is based on whether the regulatory processes leading to the change involved legislative-like procedures or were ad hoc, discretionary, and easily reversible actions."

*Id.* at 768. Where there "are no formal processes required to effect the change, significantly more than the bare solicitude itself is necessary to show that the voluntary cessation moots the claim." *Id.*

Plaintiff asserts that the change is "ad hoc, discretionary, and easily reversible." Pl's Resp., ECF No. 29, PageID.1321-22. Plaintiff explains that the affidavits presented by Defendants in support of its argument "are ad hoc statements by some, but not all, individuals who administer Defendants' Facebook pages, and show that sole discretion lay with each individual and only one agency within the city." *Id.* at PageID.1322.

Defendants respond that their actions are enough to moot Plaintiff's claims. Those actions include: (i) removal of the alleged "social media policy" from the Inkster Police Department Page; (ii) reinstatement of Plaintiff's ability to post on the Facebook pages at issue; (iii) voluntary entry into the stipulated order; and (iv) affording Blackwell "swift redress" when Defendants subsequently violated the stipulated order. Def's Repl., ECF No. 30 at PageID.1391-92. Further, Defendants assert that the affidavits it presents are from Inkster executives, supervisors and administrators, and the non-municipal employee administrator of Mayor Wimberly's page. *Id.* at PageID.1392. Defendants invoke *Wagschal v. Skoufis*, 442 F. Supp. 3d 612 (S.D.N.Y. 2020), *aff'd*, 857 F. App'x 18 (2d Cir. 2021), a case in which an out-of-circuit district court held that, because a state senator had unblocked a plaintiff and allowed him to interact with the state senator's Facebook page, the

plaintiff's claims were moot. ECF No. 27 at PageID.348-49. However, *Wagschal* is distinguishable from the case at hand for a simple reason: the *Wagschal* court noted that the senator had "refrained from any further violations, or perceived violations, consistently and voluntarily[.]" *Id.* at 622. But here, Defendants have already violated the stipulated order—albeit perhaps accidentally—which tends to undermine the strength of their claims of voluntary cessation.

*Wagschal* aside, the general principles outlined above that govern the voluntary cessation doctrine weigh against its application here. First, the change here was "ad hoc" rather than legislative, as "there [were] no formal processes required to effect the change . . . ." *Speech First*, 939 F.3d at 768. The affidavits submitted by Defendants only demonstrate that administrators of the pages in question acknowledge that they must contact Inkster's attorney before removing comments or blocking commenters to ensure they do not inhibit protected speech, and that they must inform their successors of the policy. See, e.g., ECF Nos. 27-2, 27-3, 27-5, PageID.370-71, 378-79, 389. This much more closely resembles the sort of "ad hoc" changes outlined in *Speech First*, and bears no hallmarks of a legislative or quasi-legislative change.

Additionally, Defendants have not borne their burden of demonstrating that there is no reasonable expectation that the conduct Blackwell complains of will recur. Defendants assert that they "had no reasonable opportunity before the lawsuit was filed to investigate or

address the action at issue in the Complaint . . . ." ECF No. 30 at PageID.1391. While this may be true, despite the entry of a stipulated order preserving the status quo, Defendants have already blocked Mr. Blackwell from interacting with Inkster social media pages on one occasion. Defendants argue that it "swiftly corrected" the issue within three hours. ECF No. 27, PageID.345. While the Court will decline Blackwell's request to hold Defendants in contempt,[1] Inkster's assurances and affidavits do not make it "absolutely clear" that the behavior Blackwell complains of could not reasonably be expected to recur. *See Friends of the Earth*, 528 U.S. at 189.

Further, as Blackwell notes, his claim of relief for monetary damages is not subject to a mootness challenge. ECF No. 29, PageID.1326, n.2; *Lindke v. Freed*, No. 20-10872, --- F. Supp. 3d ---, 2021 WL 4427170, at *3 (E.D. Mich. Sept. 27, 2021) (collecting cases and explaining that even if a plaintiff's claims for declaratory and injunctive relief against a city manager who blocked plaintiff from his Facebook page were moot, plaintiff's "claim for damages is sufficient to save the case from mootness."). For all the above reasons, Blackwell's claims are not moot, and the Court will proceed to analyze the merits of Blackwell's claims.

---

[1] *See*, infra, III.b.

### b. Plaintiff's contempt motion

On June 1, the city employee responsible for managing Inkster's Instagram page blocked Blackwell from commenting on the page and deleted a comment he had made. The employee averred that he had mistakenly believed he was blocking Blackwell from commenting on the employee's personal account. Seaton Aff., ECF No. 22-3, PageID.231-32. After Blackwell notified Defense counsel that he had been prevented from accessing the page, his access was restored within approximately four hours. ECF No. 22, PageID.215-16. Blackwell asks the Court to hold Defendants in contempt based on this brief denial of access.

The Court "possesses broad discretion in enforcing civil contempt and in fashioning sanctions." *Commodity Futures Trading Comm'n ex rel. Kelley v. Skorupskas*, 605 F. Supp. 923, 944 (E.D. Mich. 1985). Despite that discretion, however, contempt is a "serious" power and, reflecting that seriousness, courts must use the contempt power cautiously, employing "[t]he least possible power adequate to the end proposed." *Gascho v. Glob. Fitness Holdings, LLC*, 875 F.3d 795, 799 (6th Cir. 2017)(citation omitted).

The Court is satisfied that Defendants' blocking Blackwell from the Inkster Instagram account was inadvertent—reflected both by the sworn affidavit of the Inkster employee who blocked Blackwell saying so, *see* ECF No. 22-3, PageID.231-32, and by the fact that Blackwell's access was

immediately restored once the issue was brought to defense counsel's attention. Keeping in mind that "[c]ontempt is a measure of last resort, not first resort," *Gascho*, 875 F.3d at 799, the Court will deny Blackwell's requests to hold Defendants in contempt and to sanction Defense counsel—such a punishment does not fit the "crime." That said, Defendants are cautioned that further noncompliance with the order to which they have stipulated—whether willful or inadvertent—will be examined with close scrutiny and little solicitude.

### c. Whether Blackwell's Amended Complaint states a claim

Defendants argue that Blackwell has failed to state a claim under § 1983 because he cannot demonstrate that Defendants have violated any speech right protected by the First Amendment. ECF No. 27 at PageID.350-51. Further, Defendants assert that "there is insufficient binding legal authority from the United States Supreme Court and/or the Sixth Circuit to support [Blackwell's] demand that this Court apply forum analysis to [the Facebook pages.]" *Id*. In response, Plaintiff argues that he has sufficiently alleged that Defendants created public forums on their social media pages and censored Plaintiff's speech based on his viewpoint. ECF No. 29 at PageID.1327.

The First Amendment, applicable to the States through the Due Process Clause of the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const.

Amend. I. Application of First Amendment principles to the Internet remains a relatively new and unsettled area of law. *See, e.g., Packingham v. North Carolina*, 137 S. Ct. 1730, 1736 (2017)("This case is one of the first this Court has taken to address the relationship between the First Amendment and the modern Internet. As a result, the Court must exercise extreme caution before suggesting that the First Amendment provides scant protection for access to vast networks in that medium."). The Sixth Circuit has also recognized that "First Amendment liability of government entities for social media interactions is a new and evolving area of the law." *Lloyd v. City of Streetsboro*, No. 18-3485, 2018 WL 11298664, at *4 (6th Cir. Dec. 20, 2018).

### i. Whether forum analysis is applicable to the pages, or whether the pages are government speech

Despite limited in-circuit authority and the relative novelty of this area of law—that is, the applicability of the First Amendment to government social media pages—the Court is guided by a number of helpful cases, particularly those outlining the distinction between those spaces on the Internet that are strictly dedicated to "government speech," and those that are more comparable to a public, or limited public, forum.

In discussing possible categories of the government-created forums for speech, the Supreme Court has generally identified three types: (1) a public forum, "which by long tradition or government fiat has been devoted to assembly and debate" and within which "the rights of the state

17

to limit expressive activity are sharply circumscribed"; (2) a "limited" or "designated" public forum,[2] which is opened "for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects"; and (3) a nonpublic forum, access to which may be regulated based on "subject matter and speaker identity" so long as such distinctions are reasonable and viewpoint neutral. *Kincaid v. Gibson*, 236 F.3d 342, 348 (6th Cir. 2001) (internal marks and citations omitted). These principles apply not only to physical forums bound in a "spatial or geographic sense," but also to "metaphysical" forums—like the Internet. *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 830 (1995); *Packingham*, 137 S. Ct. at 1735 (recognizing the "vast democratic forums of the Internet" as one of "the most important places" for "the exchange of views"). When the government opens a forum for speech, whether public, limited, designated, or nonpublic, as Blackwell alleges Inkster has done by creating the Facebook pages at issue here, the government may not, at a minimum, conduct "viewpoint discrimination," as Blackwell alleges Inkster did when it deleted his comments and blocked him from commenting further. *See Pleasant Grove City, Utah v.*

---

[2] Indeed, the terms, "limited' and "designated" public forums may refer to somewhat different things. *See, e.g., Bowman v. White*, 444 F.3d 967, 975 (8th Cir. 2006)(noting that "[s]ubstantial confusion exists regarding what distinction, if any, exists between a 'designated public forum' and a 'limited public forum.'"). However, that difference, if any, is immaterial to the motion currently before the court.

*Summum*, 555 U.S. 460, 469-470 (2009)(viewpoint discrimination is forbidden in public, nonpublic, and designated public forums).

Defendants characterize the Facebook pages entirely differently—they argue that the pages are not any kind of forum, and that such forum-based analysis is not applicable. Instead, Defendants argue, the pages are merely venues for expressing "government speech," and as such are not subject to First Amendment restrictions. As the Sixth Circuit has explained, "[s]ometimes, the government uses public resources to proclaim a *government* message. When doing so, it may promote specific viewpoints at the expense of others because the Free Speech Clause 'does not regulate government speech.'" *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transportation*, 978 F.3d 481, 490 (6th Cir. 2020)(citing *Summum*, 555 U.S. at 467)(emphasis in original). Such government speech is not obligated to be view-point neutral, because "imposing a requirement of viewpoint-neutrality on government speech would be paralyzing." *Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017). The Supreme Court has cautioned, however, that although government-speech doctrine is "important—indeed, essential," it is also "susceptible to dangerous misuse." *Id.* at 1758. The question, then, is whether the allegations regarding Inkster's social media platforms at issue in this case are sufficient to support the conclusion that Inkster created a forum for speech, or whether the pages are dedicated to the purpose of government speech alone.

In a case presenting similar issues, the Sixth Circuit reversed a district court's sua sponte dismissal of plaintiff's § 1983 claims against a municipality for infringing a plaintiff's First Amendment rights by deleting critical comments she posted on a municipal Facebook page and blocking her from further access. *Lloyd v. City of Streetsboro*, No. 18-3485, 2018 WL 11298664 at *3-4. (6th Cir. Dec. 20, 2018). The court explained that, in analyzing plaintiff's claim, it was necessary to determine whether the page was "a public forum or merely a vehicle for government or personal speech . . . ," and to determine whether the government action challenged was "attributable to viewpoint discrimination or to the application of a reasonable and nondiscriminatory restriction[.]" *Id.* at *4. The court remanded the case for further consideration, concluding that plaintiff's claims were not frivolous. *Id.* at *4.

Because of the preliminary procedural posture in *Lloyd*, the Sixth Circuit did not squarely discuss the contours of when a municipal Facebook page may be considered a forum of some kind versus when it is merely a "vehicle for" government or personal speech. But the *Lloyd* decision suggests that a plaintiff could state a plausible First Amendment claim where a plaintiff posts a critical comment on a municipal Facebook page, and the comment is deleted and the plaintiff blocked from accessing the page. Given the lack of on-point Sixth Circuit precedent, the Court will look to the decisions of other Courts to help

draw these critical distinctions. Decisions of other Courts of Appeal have addressed the issue and offer some guidance, as do a number of instructive district court cases.

The first such case is *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019).[3] In *Knight*, individuals brought a First Amendment claim after former President Donald Trump blocked them from accessing and commenting on posts made on his Twitter Account. Holding that President Trump's supervision of the "interactive features" of his Twitter account did not constitute government speech, the Second Circuit explained that "while the President's tweets can accurately be described as government speech, the retweets, replies, and likes of other users in response to his tweets are not government speech under any formulation." *Id.* at 239.

Another instructive case is *Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019). In *Davison*, the Fourth Circuit explained that a Facebook page created for the Chair of a municipal Board of Supervisors bore "the hallmarks of a public forum." *Id.* at 682. Specifically, the chairperson "intentionally opened the public comment section of the Chair's Facebook Page for public discourse . . . inviting 'ANY Loudoun citizen' to make posts to the comments section," and "placed no restrictions on the public's

---

[3] Cert. granted, judgment vacated sub nom. *Biden v. Knight First Amend. Inst. At Columbia Univ.*, 141 S. Ct. 1220 (2021)(case remanded with instructions to dismiss as moot).

access to the page" or use of its interactive components. *Id*. (cleaned up). And, "in accordance with [the Chair's] invitation, the public made numerous posts on matters of public concern." *Id*. The Fourth Circuit also noted that the Facebook page was "compatib[le] with expressive activity," given that the Chair sought an "exchange of views" by inviting public comment. *Id*. The Fourth Circuit rejected the position that the page constituted government speech, explaining that such a view failed to distinguish between the Chair's own posts—which were clearly government speech—and the "interactive components" of the page, which were "materially different." *Id*. at 686.

A third case, relied heavily upon by Defendants, is *Morgan v. Bevin*, 298 F. Supp. 3d 1003 (E.D. Ky. 2018). In that case, the United States District Court for the Eastern District of Kentucky declined to issue a preliminary injunction that would have prevented Kentucky's governor from blocking people and deleting comments on his Twitter and Facebook pages. The *Morgan* court concluded that the pages represented government speech or personal speech, and were thus not subject to forum analysis. *Id*. at 1011-12. In reaching that determination, the court focused on the "intended purpose for the accounts," and also noted that "individuals [could not] directly post on" the governor's account—they could only make comments on the governor's posts. *Id*. The Morgan court did note, however, that while the Morgan plaintiffs did "not have a strong

likelihood of success on the merits," a win on the merits for the state was not guaranteed. *Id.* at 1013.

As an initial matter, the Court declines to follow the *Morgan* case, upon which Defendants heavily rely, and cannot conclude that the interactive elements of the pages at issue, nor the pages themselves in their entirety, constitute "government speech." First, a number of subsequent decisions have criticized the *Morgan* case, and have declined to follow it. *See Attwood v. Clemons*, 526 F. Supp. 3d 1152, 1165 (N.D. Fla. 2021)(characterizing reasoning of *Morgan* as "not persuasive" and declining to follow it); *Felts v. Reed*, 504 F. Supp. 3d 978, 985-86 (E.D. Mo. 2020)(declining to follow *Morgan*); *Faison v. Jones*, 440 F. Supp. 3d 1123, 1137 (E.D. Cal. 2020)(finding *Morgan* "unpersuasive"); *Leuthy v. LePage*, No. 1:17-CV-00296-JAW, 2018 WL 4134628, at *16 (D. Me. Aug. 29, 2018)(declining "to follow key pillars of the *Morgan* Court's reasoning"); *Price v. City of New York*, No. 15 CIV. 5871 (KPF), 2018 WL 3117507, at *14 n.14 (S.D.N.Y. June 25, 2018)(declining to follow *Morgan*). Second, *Morgan* was decided without the benefit of more recent appellate decisions, such as those rendered in *Trump* and *Davison*, the latter of which explicitly rejected an identical "government speech" argument. Third, the underlying logic of *Morgan* does not persuade this Court. In the case now before the Court, Plaintiff's posting to the interactive comments section of the Facebook pages in question does not appear to implicate the concerns that animate the government speech

doctrine: that "government would not work" if the government were not allowed to engage in viewpoint discrimination in its own speech. *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015).

The situation at play in this case is readily distinguishable from those in which the Supreme Court has applied the government speech doctrine, and it does not appear to the Court that the Inkster government would be hindered by treating the comments section of the relevant Facebook pages as a forum for speech. Unlike the donated monuments found to be government speech in *Summum*, in which the Supreme Court noted that it was "hard to imagine how a public park could be opened up for the installation of permanent monuments by every person or group wishing to engage in that form of expression," 555 U.S. at 479, no such practical problems would flow from a determination that comments on the Facebooks pages at issue are not government speech—given the digital nature of the forum, an unlimited number of comments from an unlimited number of commenters could be published. Second, "persons who observe" comments posted by individuals under their own names under posts by the Inkster Police Department or Mayor Wimberly could not "reasonably[ ]interpret them as conveying some message on [the Inkster Police Department or Mayor Wimberly's] behalf." *New Doe Child #1 v. Cong. of United States*, 891 F.3d 578, 593 (6th Cir. 2018)(quoting *Walker*, 576 U.S. at 210). Indeed, the Inkster Police Department Page's "Additional Information" section explains that "the City assumes no

responsibility for the content of comments posted by users and does not endorse any opinions posted by third parties." ECF No. 25-8, PageID.322. There is no suggestion that confusion between government and user speech does or reasonably could occur. Other courts have reached the same conclusion. *See, e.g., Leuthy*, 2018 WL 4134628, at *14 (treating interactive elements of Maine governor's Facebook page as forum for speech did not implicate concerns upon which government speech doctrine rests). Therefore, the Court declines to follow *Morgan*, and the Court's analysis will instead be guided by the more recent and, in the Court's view, persuasive decisions in *Trump*, *Davison*, and other cases.

Applying these cases, the Court must determine if Blackwell's allegations about Inkster's social media pages support a finding of that they represent government speech or, conversely, if they allow for the expressive activity found in public forums. The Court will consider each of the social media pages separately, review the "policy and practice" and intent of the government, and evaluate the "nature of" the pages and their "compatibility with expressive activity." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985). The Court will not "find that a public forum has been created in the face of clear evidence of a contrary intent," nor "infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity." *Id.* at 803.

### ii.  Application of the above principles to this case

#### a. Inkster Police Department Facebook page

Defendants argue that the Inkster Police Department ("IPD") page is government speech, and therefore not subject to forum analysis. For the reasons set forth below, the Court is not persuaded, and concludes that Blackwell has plausibly alleged that the Inkster Police Department Facebook page is a forum for speech.

First, Blackwell has plausibly alleged, at this preliminary stage, that Inkster intended to create a public forum when it opened the IPD page and allowed members of the public to use the page's interactive features to comment on issues of public concern. Just as in *Davison*, the IPD page was used as a "tool of governance," and "to inform the public about serious public safety events." *Davison*, 912 F.3d at 680; *Knight*, 928 F.3d at 237 (President's Twitter account was a public forum where president "repeatedly used the Account as an official vehicle for governance and made its interactive features accessible to the public without limitation."). The "About" section of the IPD page explains that the page "is managed by the Inkster Police and was developed to assist [the IPD] in providing the highest level of service possible in our community." ECF No. 25-8, PageID.321. The "Additional Information" section states that the page is intended to "provide an avenue to communicate between the public and the police on breaking news or need

to know issues that impact the fine citizens of Inkster." *Id.* at PageID.322. This is the sort of "tool of governance" contemplated by *Davison. See also, Garnier v. Poway Unified Sch. Dist.*, No. 17-CV-2215-W (JLB), 2019 WL 4736208, at *7 (S.D. Cal. Sept. 26, 2019)(school board members' Facebook pages were used as "tool of governance" and were thus forums for speech where they were used to inform public of board members' official activities).

And just as in *Davison*, other than reserving the right to remove certain comments and block users, IPD "placed no restrictions on the public's access to the page or use of the interactive component of the [IPD page]." *Davison*, 912 F.3d at 682; *see also Faison v. Jones*, 440 F. Supp. 3d 1123, 1135 (E.D. Cal. 2020)(that a page administrator has exercised limited editorial control by "using a profanity filter, limiting who can make direct posts, hiding and deleting some comments, and banning numerous profiles" from accessing a page "does not diminish its status as a public forum."); And here, like there, "in accordance with [IPD's] invitation, the public," including Blackwell "made numerous posts on matters of public concern." *Davison*, 912 F.3d at 682; Am. Compl, ECF No. 25 at PageID.272-73

Second, the interactive features of the page are no doubt "compatible with expressive activity." Visitors to the Facebook page may post comments under any post, expressing their views on the topic, or may "like" posts to show their approval or endorsement. *See* ECF No. 25,

PageID.284; IPD Page Screenshots, ECF No. 25-6, PageID.316. As other courts have observed, the "interactive nature of Facebook" is one of the platform's "defining characteristics." *Garnier v. Poway Unified Sch. Dist.*, No. 17-CV-2215-W, 2019 WL 4736208 at *10 (S.D. Cal. Sept. 26, 2019)(concluding that Facebook and Twitter were compatible with expressive activity); *Davison*, 912 F.3d at 682 (concluding that Facebook page of public official was compatible with expressive activity and collecting cases).

Inkster created a Facebook page for its police department with the express goal being to "provide an avenue to communicate between the public and the police." Am. Compl. Ex. G, ECF No. 25-8, PageID.322. Inkster invited the public to comment on posts on the page, and the public has done so. And Inkster has done all of this on a platform that is, without doubt, compatible with expressive activity. Therefore, the Court is satisfied that Blackwell has sufficiently alleged facts allowing the conclusion that the IPD page is a forum for public speech and not merely a conduit of government speech.

### b. Mayor Wimberly Facebook page

Regarding Mayor Wimberly's Page, Defendants argue that the page is a means for communicating both personal speech and government speech. ECF No. 27 at PageID.355. As to the government speech argument, the analysis described above applies with equal force to the Mayor's page. Just like the page at issue in *Davison*, Blackwell has

alleged that Mayor Wimberly created the page, administers it, and operates it as an extension of his political office by "disseminat[ing] information about city-related activities and issues," using the page to "speak directly to members of the public about issues concerning the city," and "engag[ing] in written dialogue with the public in the comments beneath posts." Am. Compl, ECF No. 25 at PageID.283. And the Wimberly page "enables comments to be posted from the general public" on all posts. *Id.*; Wimberly Page Screenshots, ECF No. 25-9, PageID.324.

Defendants raise another argument with respect to the Mayor Wimberly page: that it is a vehicle for personal speech. Defendants note that the Wimberly page was created *before* he was elected mayor, ECF No. 27, PageID.359. But, as the Second Circuit observed in *Knight*, "this litigation concerns what the [a]ccount is now." *Knight*, 928 F.3d at 231. Blackwell sufficiently alleges that, just as the Twitter account in *Knight* did, the Mayor Wimberly page "bear[s] all the trappings of an official, state-run account." *Id.* Blackwell alleges that the page is titled "Patrick Wimberly-Mayor City of Inkster," bears "the City of Inkster logo and tagline," Am. Compl., ECF No. 25 at PageID.282-83, and has been used "as a channel for communicating and interacting with the public" about matters of government. *Knight*, 928 F.3d at 235; *see also Garnier*, 2019 WL 4736208, at *9 (school board members created public forums in the interactive sections of their Facebook pages when they "post[ed] content

29

related to their positions as public officials [and] opened their pages to the public without limitation[.]").

At this preliminary stage, Blackwell has sufficiently alleged facts allowing the conclusion that Defendants created public forums in the interactive portions of both pages, given the policy and practice of Defendants' use of these pages, the nature of the pages, and their clear compatibility with expressive conduct.

### iii. Whether Blackwell has sufficiently alleged viewpoint discrimination

For the reasons explained above, the Court is satisfied that the First Amendment public forum analysis is the proper lens through which these Facebook pages should be examined, and that Defendants created some manner of forum for speech. Now the Court must determine whether Blackwell has sufficiently alleged that deleting his comments and blocking him from making more violated the Constitutional limitations that apply to government-established forums for speech. However, the Court will not, and need not, determine precisely what sort of forum the pages in question are, because viewpoint discrimination— as is alleged here—is forbidden in any kind of government-established forum. *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transportation*, 978 F.3d 481, 491 (6th Cir. 2020)(even in nonpublic forums, "viewpoint discrimination" is forbidden).

Reviewing the allegations, it is clear that Blackwell has plausibly alleged that he was subject to viewpoint discrimination. His posts were deleted, he says, because they were critical of Mayor Wimberly and other Inkster officials. Am. Compl., ECF No. 25, PageID.287. Taking this as true, as the Court must in this procedural posture, Blackwell's allegations are sufficient to state a claim. Indeed, as the Fourth Circuit observed in *Davison*, blocking a commenter "because of his allegation of governmental corruption"—as Blackwell alleges happened here— "constitutes black-letter viewpoint discrimination." *Davison*, 912 F.3d at 687 (collecting cases). Finally, Defendants do not dispute Blackwell's contention that the IPD's blocking of Blackwell constituted or represented a municipal policy or custom, nor that Mayor Wimberly possessed the final authority to establish municipal policy with respect to the action at issue here (management of his Facebook page). The consequence of Defendants' failure to challenge these allegations is that, for purposes of this motion, Blackwell has sufficiently alleged that Inkster is liable for the allegedly unconstitutional actions of the Inkster Police Department and Mayor Wimberly. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978)(municipality may be held liable for constitutional violations stemming from "official municipal policy"); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-82 (1986). (municipality may be liable for actions by a decisionmaker who

"possesses final authority to establish municipal policy with respect to the action ordered.")

### d. Whether Mayor Wimberly is entitled to qualified immunity

Defendants argue that this case should be dismissed against Mayor Wimberly in his individual capacity because injunctive relief under 18 U.S.C. § 1983 would be properly directed against the Mayor in his *official*, not individual, capacity; and because any claims seeking recovery of money damages from Mayor Wimberly in his individual capacity must be dismissed on the basis of qualified immunity. As to the former contention, Defendants are correct: as the Sixth Circuit has explained, in the context of § 1983 suits, "individual Defendants can be sued in their *individual* capacity for *money damages*, and additionally, the individual Defendants can be sued in their *official capacity* as to [an] *injunction* (because injunctions run against the office, not the individual)." *Gay v. Cabinet for Health & Fam. Servs. Dep't for Cmty. Based Servs.*, No. 18-5285, 2019 WL 1338524, at *5 (6th Cir. Jan. 23, 2019)(emphasis in original)(citing *Kentucky v. Graham*, 473 U.S. 159, 166, n.11 (1985)). As such, the Court will assess whether Mayor Wimberly in his individual capacity is entitled to qualified immunity from Blackwell's claim for money damages.

The doctrine of qualified immunity generally shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Public officials thus are eligible for qualified immunity if (1) they did not violate any constitutional guarantees or (2) the guarantee, even if violated, was not 'clearly established' at the time of the alleged misconduct." *Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016) (citing *Pearson*, 555 U.S. at 232). "Both inquiries are 'objective,' as they turn on what the law is today and whether it was clearly established at the time of the challenged action." *Husted*, 810 F.3d at 440 (citing *Harlow*, 457 U.S. at 818-19).

As explained above, there is a dearth of Sixth Circuit authority addressing whether blocking critics and deleting their comments on municipal Facebook pages violates the First Amendment, and every court to consider the issue has noted its novelty. *See, e.g., Morgan v. Bevin*, 298 F. Supp. 3d 1003, 1009 (E.D. Ky. 2018)("This Court is mindful that it is one of the first to wrestle with the intersections of the application of free speech to developing technology and First Amendment rights of access to public officials using privately-owned channels of communication. It is a case of first impression in the Sixth Circuit and, if appealed, would be a case of first impression to the Supreme Court of the United States as well."); *Novak v. City of Parma*, 932 F.3d 421, 434 (6th Cir. 2019) ("Courts have not reached consensus on how First Amendment protections will apply to comments on social media platforms.") And while several out-of-

circuit cases have found constitutional violations on similar facts, such non-binding authority from other circuits is "usually irrelevant to the 'clearly established' inquiry," except for those "extraordinary" cases where those decisions "both point *unmistakably* to a holding and are *so clearly* foreshadowed by applicable direct authority as to leave *no doubt* regarding that holding." *Ashford v. Raby*, 951 F.3d 798, 804 (6th Cir. 2020)(internal marks and citation omitted, emphasis in original). Here, those criteria are not met.

While, as Blackwell points out, *see* ECF No. 29, PageID.1341, the right to free expression in public forums has been clearly established for decades, the applicability of those doctrines to social media is anything but. Therefore, Mayor Wimberly is entitled to qualified immunity. Because Mayor Wimberly is entitled to qualified immunity in his individual capacity on Blackwell's claim for damages and, as discussed above, injunctive relief against Mayor Wimberly under § 1983 would properly run against the Mayor in his official, not individual, capacity, all claims against Mayor Wimberly in his individual capacity will be dismissed.

## IV. Conclusion

Blackwell has sufficiently alleged facts showing that Inkster's web pages were established as forums for speech. He has also has sufficiently alleged that Defendants engaged in viewpoint discrimination when they banned him from the pages and prevented him from commenting further.

However, Mayor Wimberly is entitled to qualified immunity for claims brought against him in his individual capacity. For these reasons, Defendants' motion to dismiss (ECF No. 27) is **DENIED** with respect to Plaintiff's claim in Count I against the City of Inkster, and Plaintiff's claims in Count II against the City of Inkster and Mayor Wimberly in his official capacity. Defendant' motion to dismiss is **GRANTED** with respect to Plaintiff's claim in Count II against Mayor Wimberly in his individual capacity, which is **DISMISSED WITH PREJUDICE**. Plaintiff's motion for contempt (ECF No. 17) is **DENIED**.

    **IT IS SO ORDERED.**


Dated: March 31, 2022    s/Terrence G. Berg
                          TERRENCE G. BERG
                          UNITED STATES DISTRICT JUDGE